**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

SEB, S.A.,                                               99 Civ. 9284 (SCR)
                          **Plaintiff,**

                                                          **MEMORANDUM**
          v.                                             **DECISION AND ORDER**

**MONTGOMERY WARD & CO.,**
**INC., GLOBAL-TECH APPLIANCES,**
**INC., AND PENTALPHA**
**ENTERPRISES, LTD.,**
                          **Defendants.**
_____

**STEPHEN C. ROBINSON, District Judge:**

> SEB, S.A. ("SEB" or "Plaintiff") claims that Pentalpha Enterprises and Global-

Tech Appliances[1] ("Defendants") copied SEB's deep fryer and sold it to Montgomery

Ward.[2] After discovery was completed, Defendants brought this motion for summary

judgment. For the reasons set forth below, Defendants' motion is denied.

> During oral argument on the summary judgment motion, SEB asked this Court to

order Defendants to turn over documents from one of Defendants' attorneys. For the

reasons set forth below, Defendants are ordered to turn over materials concerning

opinions rendered by Thomas L. Adams, Esq.


## I. Background

> This case was originally before Judge Barrington D. Parker. SEB filed two

preliminary injunction motions and he granted both of them. In granting the first

preliminary injunction motion, Judge Parker held that Defendants' "use and sale [of the

_____
[1] Global-Tech is the parent company of Pentalpha. Global-Tech was formally known as Wing Shing International, (BVI) Ltd.
[2] Montgomery Ward has since gone out of business, so the case is proceeding against the remaining defendants. SEB asserts that Defendants also sold the deep fryer to Sunbeam and Fingerhut.

original fryer] in the United States" infringed SEB's patent. 77 F. Supp. 2d 399, 403 (S.D.N.Y. 1999). On appeal, the Federal Circuit affirmed the preliminary injunction. 243 F.3d 566, 2000 WL 1673667 (Fed. Cir. Nov. 6, 2000) (unpublished). Defendants then modified their deep fryer. SEB filed a second preliminary injunction motion, and, in granting the second motion, Judge Parker held that the modified fryer also infringed SEB's patent. 137 F. Supp. 2d 285, 289 (S.D.N.Y. 2001).

The case was reassigned to Judge Richard C. Casey after Judge Parker was elevated to the Second Circuit. On October 1, 2002, Judge Casey denied Global-Tech's motion to dismiss and denied SEB's motion to amend the complaint to add three defendants. 2002 WL 31175244 (S.D.N.Y. Oct. 1, 2002) (unpublished).

After Defendants filed their motion for summary judgment, the case was assigned to this Court.

There is a related case in the U.S. District Court for the Southern District of Florida ("Florida Action"). SEB brought a patent infringement case against Defendants and Sunbeam, one of Defendants' several customers that bought deep fryers, in the U.S. District Court for the District of New Jersey. Several months later, Sunbeam brought an indemnity claim against Defendants. Pentalpha then brought a counterclaim against Sunbeam for a breach of their product supply agreement, which involved the manufacture and sale of the deep fryers. The court dismissed SEB's claim against Defendants for lack of personal jurisdiction, but Sunbeam settled with SEB for $2 million. The case was subsequently transferred to the Southern District of Florida. The final judgment, which was based on the jury verdict, ultimately awarded $3,202,216 to Pentalpha. Pentalpha's

judgment against Sunbeam was affirmed by the 11th Circuit. *SEB S.A. v. Sunbeam Corp.*, 2005 WL 1926418 (11th Cir. Aug. 12, 2005).

This Court signed an Order of Attachment for the amount of the judgment in the Florida Action – $3,202,216 – and any additional prejudgment interest. Defendants filed a motion to modify the Order of Attachment, but this Court denied Defendants' motion and affirmed its Order.

## II. Discussion
### A. Summary Judgment Motion

Defendants make three arguments in their motion for summary judgment. First, Global-Tech argues that it is entitled to summary judgment because Pentalpha's allegedly infringing conduct is not attributable to Global-Tech. Second, Pentalpa argues that it is entitled to summary judgment because it did not directly infringe on SEB's patent nor did it induce infringement of SEB's patent. Finally, Defendants argue that this Court should dismiss SEB's damage claim for lost profits because SEB did not sell any deep fryers and, therefore, does not have any lost profits to reclaim.

### 1. Standard of Review

Summary judgment is appropriate only if "there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*

The initial burden falls on the moving party who is required to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998)).

### 2. Relationship Between Global-Tech and Pentalpha

Global-Tech, the parent company of Pentalpha, argues that it is entitled to summary judgment because Pentalpha's conduct is not attributable to Global-Tech. Specifically, Global-Tech asserts that SEB has not shown any evidence of fraud, lack of corporate formality, or agency that would allow a jury to find Global-Tech liable for Pentalpha's conduct.

In response, SEB argues that summary judgment should be denied because the jury in the Florida Action found that "'Pentalpha and Global-Tech [wer]e alter-egos of each other.'" *SEB S.A. v. Sunbeam Corp.*, 2005 WL 1926418, NO PAGE CITE, No. 04-12465 (11th Cir. August 12, 2005) (quoting the jury verdict). The 11th Circuit affirmed the jury's verdict, concluding that the District Court properly refused to grant a judgment as a matter of law for Defendants on this issue.[3] *Id*. SEB further argues that it has

---

[3] In denying Global-Tech's motion to dismiss on the question of whether Defendants were alter-egos of each other, the District Court noted: "they're making it very hard for anybody to sue them and get

presented evidence creating a genuine issue of material fact about whether there are no

corporate formalities between Global-Tech and its subsidiaries and whether its

subsidiaries have acted as its agent.

While Federal Circuit precedents are not entirely clear about when to find a parent

liable for a patent infringement by its subsidiary, this Court has previously observed that

"the clearest statement from these cases suggests that the standard for piercing the

corporate veil must be met before a parent may be held liable for the acts of its subsidiary

. . . ." *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F.Supp.2d 210, 217 (S.D.N.Y.

2005) (Robinson, J.) (discussing *Tegal Corp. v. Tokyo Electron Co.,* 248 F.3d 1376, 1380

(Fed.Cir. 2001) and *A. Stucki Co. v. Worthington Industries, Inc.,* 849 F.2d 593, 596-97

(Fed.Cir. 1988)). Accordingly, "[t]he corporate entity deserves respect and legal

recognition unless specific, unusual circumstances justify disregarding the corporate

structure. The most common reason for disregarding the corporate structure is that the

'corporation was merely the alter ego of its officers.'" *Al-Site Corp. v. VSI Intern.,*

*Inc.*, 174 F.3d 1308, 1331 (Fed. Cir. 1999) (quoting *Manville Sales Corp.*, 917 F.2d at

552); *see also Insituform Technologies, Inc.*, 385 F.3d at 1371 ("[A] corporate entity may

be disregarded if doing so will prevent fraud, illegality, injustice, a contravention of

public policy, or prevent the corporation from shielding someone from criminal

liability.").

Global-Tech is not entitled to summary judgment on this issue. The jury in the

Florida Action found that "'Pentalpha and Global-Tech [wer]e alter-egos of each other.'"

*SEB S.A. v. Sunbeam Corp.*, 2005 WL 1926418, NO PAGE CITE, No. 04-12465 (11th

---

jurisdiction. They've got all these different companies. I don't know how anybody dealing with them is
supposed to know which company to deal with. In fact, they even sell the same product through different
companies." (Miller Letter, March 10, 2004, Ex. 3 at 198:24.) This Court has similar concerns.

Cir. August 12, 2005) (quoting the jury verdict). Further, the Eleventh Circuit found that there was evidence "that Global-Tech engaged in improper conduct through its organization or use of Pentalpha." *Id*. Because a reasonable jury in Florida found that Global-Tech and Pentalpha were the alter-egos of each other, a reasonable jury in New York could reach the same conclusion and therefore find that Global-Tech is liable for Pentalpha's alleged infringement of SEB's patent.

### 3. Patent Infringement

Defendants next argue that it is entitled to summary judgment because it did not directly infringe SEB's patent nor did it induce any infringement of SEB's patent. SEB argues, however, that Defendants both directly infringed on its patent and induced infringement of its patent. This Court finds that there are genuine issues of material fact that preclude summary judgment on this issue.

### a. 271(a)

Pentalpha argues that it did not directly infringe SEB's patent because it manufactured the deep fryers in Hong Kong and sold them "FOB China."[4] Defendants' argue that because Pentalpha sold the deep fryers FOB China, it did not "make, use, sell or offer to sell any allegedly infringing deep fryers in the United States or import them into the United States." (Def. Memo at 4.)

---

[4] "FOB" or "free on board" is "a method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1374 (Fed. Cir. 2005).

Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention . . . infringes the patent." 35 U.S.C. § 271(a) (2000). As a result, "'[t]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated of acts wholly done in a foreign country.'" *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000) (quoting *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 650 (1915)); *see also MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005) ("It is well-established that the reach of section 271(a) is limited to infringing activities that occur within the United States.").

Simply because Pentalpha sold the deep fryers F.O.B. China does not mean that it did not offer to sell the deep fryers in the United States. According to the Federal Circuit, "the meaning of 'offer to sell' is to be interpreted according to its ordinary meaning in contract law, as revealed by traditional sources of authority." *Rotec Indus., Inc.*, 215 F.3d at 1255. Therefore, to make an offer to sell, a defendant "must 'communicate[ ] a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *MEMC Electronic Materials, Inc.*, 420 F.3d at 1376 (quoting *Rotec Indus., Inc.*, 215 F.3d at 1257). In examining whether Pentalpha offered to sell the deep fryers in the United States, this Court must be mindful that "[o]ne of the purposes of adding 'offer [ ] to sell' to section 271(a) was to prevent [a defendant from] . . . generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *See id.* (quoting *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1379 (Fed.Cir. 1998)

(finding that although the price quotation letters stated that they were not offers, the letters could be considered offers under § 271(a))).

Moreover, that a product is sold F.O.B. China or F.O.B. United States, does not, by itself, determine where a product is sold for the purposes of § 271(a). According to the Federal Circuit, "simply because an article is delivered 'free on board' outside of the forum, a 'sale' is not necessarily precluded from occurring in the forum." *MEMC Electronic Materials, Inc.*, 420 F.3d at 1377; *see also North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (holding that, for the purposes of personal jurisdiction, the patent infringement took place in Illinois even though the infringing products were sold F.O.B. Texas and California); *cf. Cybiotronics Ltd. v. Golden Source Elec.*, 130 F. Supp. 2d 1152, 1173 (C.D. Cal. 2001) (holding that no sales took place in the United States for the purposes of § 271(a) because the plaintiff did not introduce any evidence that any sales-related activities occurred in the U.S. and defendant, in China, sold the phones to an American company and shipped the phones from China to Hong Kong pursuant to "F.O.B. Hong Kong" terms and that company then sold the phones to other American companies and shipped the phones from Hong Kong to the United States pursuant to "F.O.B. Hong Kong" terms); *Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. Gmbh*, 2002 U.S. Dist. LEXIS 23050, *17-23 (D. Cal. September 5, 2002) (holding that despite the F.O.B. Germany designation, the defendant was liable under § 271(a) because the defendant's top executive admitted that the defendant offer to sell and sold the infringing product in the U.S., and the defendant admitted the same in its responses to the plaintiff's request for admissions).

Despite Pentalpha's claim that it did not offer to sell or sell the deep fryers in the United States because the deep fryers were sold F.O.B. China, SEB's claim that Defendants directly infringed on SEB's patent survives summary judgment because SEB presented evidence that indicating that Pentalpha did offer to sell or sell the deep fryers in the United States.[5]

SEB presented evidence that would allow a reasonable jury to conclude that Defendants made an offer to sell the deep fryers to Fingerhut in the United States.[6] SEB asserts that Pentalpha has a formal vendor relationship, through its representative Dan Mullins, with Fingerhut, a company based in the United States. Defendants argue, however, that "SEB . . . presented no evidence that Mr. Mullins made any offer on behalf of Pentalpha . . ." (Def. Reply Mem. at 2.) Defendants' statement is disingenuous, at best. On a "Terms of Purchase" agreement between Pentalpha and Fingerhut, Dan Mullins is listed as a "negotiator," "Rep.," and "U.S. Contact" for Pentalpha. (Miller Decl. Ex. 5.) In a deposition, Steve Knutson of Fingerhut identified Dan Mullins as "the representative for Pentalpha that calls on Fingerhut" and the person "our buyer was working with." (Knutson Dep. May 31, 2001, at 9, 18.) According to Mr. Knutson,

---

[5] If this Court's discussion of the various companies and their relationships with Defendants is unclear, it is because, in the opinion of this Court, the true nature of these relationships and transactions are not clearly spelled out in any of the moving papers.

[6] Defendants' assertion that "offers in the United States to sell accused products outside of the United States do not satisfy § 271" is inaccurate. Defendants cite a case from a district court in Texas concerning a product that was sold and used in Norway. *See Quality Tubing, Inc. v. Prescisio Tube Holdings Corp.*, 75 F. Supp. 2d 613, 625 (S.D. Tex. 1999). If this Court required that both the offer to sell and the actual sale of the infringing product take place in the United States, it would "make[] the 'offer to sell' language in § 271(a) superfluous." *Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 256 F.Supp.2d 228, 234 (D.Del. 2003) (rejecting the argument that an "offer to sell" for the purposes of § 271(a) can only take place if there is also a sale of the infringing product in the United States). Further, as noted above, the purpose of the "offer to sell" language is "to prevent . . . [a defendant from] generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *MEMC Electronic Materials, Inc.*, 420 F.3d 1369, 1376 (quoting *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373 (Fed.Cir. 1998)). Any offers that Defendants made in the United States would work to the commercial detriment to SEB, regardless of whether the resulting sales took place in the United States or China.

Fingerhut began working with Pentalpha because "*Dan Mullins called on our buyer*, Todd Seeley, on July 23, 1998," and participated in "a meeting in the Fingerhut building here [Minnesota], where he was showing a number of vendor's products to Todd." (Knutson Dep. May 31, 2001, at 19.) (emphasis added). There is also an e-mail from Jason Wong at Pentalpha to Dan Mullins, which is described by Mr. Knutson as "an e-mail from Pentalpha, giving Dan Mullins the beneficiary information to complete our vendor setup." (Knutson Dep. May 31, 2001, at 16.) Moreover, any purchase orders for the deep fryers were sent to Pentalpha (or Pentalpha Hong Kong) via Mr. Mullins.[7] (Knutson Dep. May 31, 2001, at 9.) A reasonable jury could easily conclude that at some point after Mr. Mullins showed up at Fingerhut to show Mr. Seeley Pentalpha's products and before Fingerhut employees filled out the Terms of Purchase, Mr. Mullins made an offer to sell the deep fryers. Further, because both Fingerhut and Mr. Mullins are based in the United States and conducted at least their initial meeting in the United States, a reasonable jury could conclude that an agent of Defendants offered to sell the deep fryers in the United States, thereby triggering § 271(a).[8]

A reasonable jury could also conclude that Defendants actually sold the infringing deep fryers in the United States. For example, while Defendants sold the deep fryers to Fingerhut F.O.B. China, Defendants had the 1,290 deep fryers shipped to St. Cloud,

---

[7] Defendants assert that "Fingerhut never purchased any deep fryers from Pentalpha." (Def. Reply Mem. at 2.) However, SEB was able to present evidence that Fingerhut purchased 1,290 deep fryers from Pentalpha Hong Kong, *which had the same address and the same vendor number* as Pentalpha *and listed Dan Mullins as the contact*. (Miller Decl. Ex. 5; Ex. 6.) Therefore, this Court concludes that there is at least a genuine issue of material fact about whether Fingerhut purchased deep fryers from Pentalpha.

[8] Further, Defendants seem to concede in their reply brief that a product supply agreement between Pentalpha and Sunbeam, governing the sale of the deep fryers, could constitute an offer to sell in the United States. (Def. Reply at 2-3.) The agreement could be executed in both the United States and Hong Kong – it is unclear where the contract was actually executed – and was governed by Florida law. (Miller Decl. Ex. 4.) Defendants note that SEB "refer[red]" to the agreement and then announced that "[o]ffers in the United States to sell accused produced outside the United States do not satisfy § 271." (Def. Reply at 3.)

Minnesota.[9] (Miller Decl. Ex. 6.) This Court will not permit Defendants to succeed on summary judgment on this issue simply because they shifted the risk of loss from Defendants to Fingerhut in China. *See Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. Gmbh*, 2002 U.S. Dist. LEXIS 23050, *23 (D. Cal. September 5, 2002) ("Dynamic Micro's F.O.B. argument only addresses the *risk of loss* in commercial transactions. It is clear that Dynamic Micro and its United States customers intended that Dynamic Micro ship the Model 300 to them in this country.") (emphasis in original); *cf. MEMC Electronic Materials, Inc.*, 420 F.3d at 1377 (concluding that the defendant was entitled to summary judgment when the plaintiff did not present any evidence that defendant sold an infringing product in the United States when it sold the product to a company in Japan and that company sold the product to its subsidiary in the United States); *Cybiotronics, Ltd. v. Golden Source Elecs., Ltd.*, 130 F. Supp. 2d 1152, 1158-59 (D. Cal. 2001) (finding that defendant did not sell telephones in the United States when the plaintiff did not present any evidence that defendant sold an infringing product in the United States and defendant, in China, sold the phones to an American company and shipped the phones from China to Hong Kong pursuant to "F.O.B. Hong Kong" terms and that company then sold the phones to other American companies and shipped the phones from Hong Kong to the United States pursuant to "F.O.B. Hong Kong" terms). If this Court held otherwise, it would essentially remove foreign manufacturers from the reach of § 271(a) because they would simply shift the risk of loss – using the F.O.B. designation – to the American corporations before the goods reached our shores.

---

[9] SEB argues that because Pentalpha knew its deep fryers would be sold in the United States, it is liable under § 271(a). However, "[m]ere knowledge that a product sold overseas will ultimately be imported into the United States is insufficient to establish liability under section 271(a)." *MEMC Electronic Materials, Inc.*, 420 F.3d at 1377.

In short, because there are genuine issues of material fact over whether Defendants offered to sell or sold the infringing deep fryers in the United States, this Court must deny Defendants' motion for summary judgment on this issue.

b. 271(b)

Defendants also argue that they did not induce infringement of SEB's patent. Under § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271 (2000). To establish liability under this provision, a plaintiff must show two factors: first, that there was a direct infringement and, second, "a certain level of intent on the part of the alleged inducer that the patent be infringed." *Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1377 (Fed. Cir. 2004) (citing *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir. 1988)).

Here, only Defendants' intent is at issue as Defendants are not contesting direct infringement at this stage of the proceedings.[10] To prove intent, SEB may use circumstantial evidence. *See, e.g.*, *MEMC Electronic Materials, Inc.*, 420 F.3d at 1378 (citing *Water Techs. Corp.*, 850 F.2d at 668). In examining SEB's evidence, this Court is to be mindful of the fact that "[i]ntent is a factual determination particularly within the province of the trier of fact . . . ." *Insituform Technologies, Inc.*, 385 F.3d at 1378 (citing *Water Techs. Corp.*, 850 F.2d at 669).

The Federal Circuit has recently acknowledged that there is "a lack of clarity concerning whether the required intent must be merely to induce the specific acts or

---

[10] Judge Parker has already found, in granting two preliminary injunctions, that Defendants' deep fryers infringed SEB's patent. Further, Defendants acknowledged in the oral argument for this motion that whether Defendants' deep fryer infringed SEB's patent is not an issue in this motion. (Transc. 3/24/04 at 11.)

additionally to cause an infringement." *Id*. (refusing to resolve the ambiguity) (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) and *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990)); *see also Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005); *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005); *MEMC Electronic Materials, Inc.*, 420 F.3d at 1378 n.4. In *Manville*, the court held that "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp.*, 917 F.2d at 553 (emphasis in original). In contrast, the court in *Hewlett-Packard* held that the plaintiff only needs to show that the alleged infringer had an "actual intent to cause the acts which constitute the infringement . . . ." *Hewlett-Packard Co.*, 909 F.2d at 1469. Because this Court finds that Defendants are not entitled to summary judgment under either standard, it is unnecessary to attempt to resolve the "lack of clarity" within the Federal Circuit.[11]

Because Defendants knew about SEB's patent at least as of July 10, 1998 yet continued to sell the deep fryer until Judge Parker granted SEB's second preliminary injunction motion, a reasonable jury could conclude that Defendants improperly induced infringement within the meaning of § 271(b). If a defendant knows about a patent yet continues to sell the infringing product, a reasonable jury can find the defendant liable under § 271(b). *See, e.g.*, *Minnesota Mining and Manufacturing Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (finding knowledge of a patent and supplying the

---

[11] Judge Parker briefly addressed this issue in an opinion, dated June 26, 2001, denying SEB's motion for contempt sanctions. He concluded that SEB had not shown the specific intent required under *Manville* "*on the current state of the record and for purposes of this contempt proceeding.*" (Opinion at 7.) (emphasis added). This Court, therefore, is not bound by Judge's Parker's conclusion in deciding this summary judgment motion.

infringing product sufficient to create liability under § 271(b)); *cf. MEMC Electronic Materials, Inc.*, 420 F.3d at 1379-80 (finding knowledge of a patent and providing product support sufficient to create liability under § 271(b)). Here, SEB sued Sunbeam for patent infringement on March 10, 1998. SEB added Defendants to the lawsuit on July 10, 1998. Thus, at least as of that date, Defendants were aware of the existence of SEB's patent.[12] Not only were Defendants' aware of SEB's patent, but they continued to sell their deep fryer, or a similar version, until March 20, 2001, when Judge Parker issued his second preliminary injunction against Defendants. From these facts, a reasonable jury could find, especially because "[i]ntent is a factual determination particularly within the province of the trier of fact," *Insituform Technologies, Inc.*, 385 F.3d at 1378, that Defendants are liable under § 271(b).

Defendants argue that SEB cannot establish the requisite intent because Defendants reasonably relied on an opinion from competent patent counsel. Defendants argue that they received "non-infringement opinions" from counsel and relied on these opinions in selling the deep fryers. (Def. Mem. at 6.) While the Federal Circuit has suggested that reliance on counsel can help avoid liability under § 271(b), the Federal Circuit has never held that reliance on counsel is dispositive of liability under § 271(b). *See Manville Sales Corp.*, 917 F.2d at 553-54 (finding summary judgment for officers of the defendant appropriate because there was no evidence or findings that any of the officers had the requisite intent and noting the existence of "good faith belief" based on existence of counsel); *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1261 (Fed. Cir. 1999) (finding summary judgment for an officer of the defendant

---

[12] Before Defendants began selling their deep fryer, they were aware of the fact that SEB had developed a deep fryer as Defendants used SEB's deep fryer as a reference when developing their own deep fryer. Thus, they may have been aware of SEB's patent prior to July 10, 1998.

appropriate because the officer relied on counsel, "*among other things*," and the "undisputed facts [did] not establish the knowledge necessary to find inducement to infringe") (emphasis added). Moreover, a defendant can be found liable under § 271(b) even when it asserts that it relied in good faith on the opinion of counsel. *See Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1379 (Fed. Cir. 2001) (following the *Manville* standard and holding that a jury could find liability under § 271(b) even when the defendants asserted that they relied on counsel in good faith because the defendant knew about the patent and continued to sell the infringing product). Thus, Defendants cannot avoid liability under § 271(b) simply because they obtained opinions from counsel.

### 4. Lost Profits

Defendants argue that because SEB, a holding company, did not manufacture or sell the deep fryers, SEB cannot make a claim for lost profits.[13] T-Fal Corporation, a subsidiary of SEB, manufactured and sold the deep fryers in the United States. Defendants argue that only T-Fal, which is not a party in this case, can make a claim for lost profits.[14]  Despite Defendants' arguments, this Court will permit SEB to present a

---

[13] Judge Parker operated under the assumption that SEB sold the deep fryer. He found, in considering SEB's first preliminary injunction motion, that Defendants' deep fryer impacted SEB's sales. "Montgomery Ward's sale of its deep fryer takes away sales which could have been made by SEB. This competition has the result of decreasing SEB's market share and decreasing its revenues through reduced prices." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399, 402 (S.D.N.Y. 1999). Judge Parker also found that "SEB . . . has lost market share, has been required to lower its prices, and has lost consumer confidence." *Id*. at 405. He concluded that "[t]he extent of these lost sales cannot be accurately quantified." *Id*. at 402.

[14] Defendants also argue that SEB should not be allowed to recover the profits of its subsidiaries because SEB would evade United States corporate income taxes. This is a matter for the Internal Revenue Service and is not squarely before this Court. Therefore, this Court will not consider or address whether SEB is attempting to evade corporate income taxes by leaving T-Fal out of this suit.

damage claim for any income they may have lost because of Defendants' alleged infringement.

The Patent Act provides for "damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (2000). Reasonable royalty, then, is the minimum amount a plaintiff could recover for patent infringement. *See, e.g.*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc) (noting that the "purpose of [the reasonable royalty] alternative is not to direct the form of compensation, but to set a floor below which damage awards may not fall").

While the patent holder "bears the burden of proving its damages," *Crystal Semiconductor Corp. v. Tritech Microelectrics International, Inc.*, 246 F.3d, 1336, 1353 (Fed. Cir. 2001), this Court has "considerable latitude in assessing damages." 60 Am. Jur. 2d *Patents* § 957 (2005). "Because fashioning an adequate damages award depends on the unique economic circumstances of each case, the trial court has discretion to make important subsidiary determinations in the damages trial, such as choosing a methodology to calculate damages." *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996). While the trial court chooses the appropriate methodology, "[t]he measurement of patent damages is a question of fact." *Crystal Semiconductor Corp.*, 246 F.3d at 1346; *see also Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (citing *Rite-Hite Corp.*, 56 F.3d at 1544) (noting that while the amount of lost profits is a question of fact, whether lost profits are available is a question of law).

As an initial matter, the parties, as well as many courts, seem to assume that there are only two types of damages a patent holder can recover: lost profits and reasonable royalties. According to the Supreme Court, however, "Congress intended in § 284 that a 'patent owner would in fact receive full compensation for any damages [the patent owner] suffered as a result of the infringement.'" *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (quoting *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654 (1983)). While "adequate damages *can* include lost profits," *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996) (emphasis added), such damages do not need include lost profits.

When Defendants assert that SEB cannot recover lost profits because SEB did not sell deep fryers, Defendants oversimplify admittedly convoluted case law and ignore the underlying goal of § 284. The Federal Circuit, in two cases, one of which is an en banc opinion, has held that a "patent owner who has suffered lost profits is entitled to lost profits damages regardless of whether the patent owner has made, used, or sold the patented device." *Rite-Hite Corp.,* 56 F.3d at 1548 (en banc); *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995); *cf. Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 Fed. Appx. 387, 397 (Fed. Cir. 2004) (unpublished) (noting that a wholly-owned subsidiary could recover for lost profits of parent corporation for the period before the date that the parent corporation assigned the patents to the subsidiary). *But see Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996) (ignoring Federal Circuit precedent and concluding that "[w]hen the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages"). Thus, the Federal Circuit has not

required a patent owner to sell the patented product before the patent owner can recover lost profits from an infringer.

While the exact holding of *Rite-Hite* and *King Instruments* is not directly applicable here,[15] the reasoning behind both opinions is extremely instructive and supports the conclusion that SEB should be allowed to present evidence that it lost money because of Defendants' actions. Both opinions discussed the implications of the far-reaching language of § 284. In *Rite-Hite*, the court noted that "the language of the statute is expansive rather than limiting." 56 F.3d at 1544. The court continued:

> the Supreme Court has interpreted [§ 284] to mean that "adequate" damages should approximate those damages that will *fully compensate* the patentee for infringement. Further, the Court has cautioned against imposing limitations on patent infringement damages, stating: "When Congress wished to limit an element of recovery in a patent infringement action, it said so explicitly."

*Id.* at 1545 (quoting *General Motors,* 461 U.S. at 653) (emphasis in original). Similarly, in *King Instruments*, the court found that the "broad language [of § 284] awards damages for any injury as long as it resulted from the infringement. . . . [I]t mandates an amount 'adequate to compensate for the infringement.'" 65 F.3d at 947 (quoting 35 U.S.C. § 284). Thus, the court held that "[a]s long as the patentee receives a proper economic return on its investment in the acquisition of a patent, the Act does not require that return to come from the sale of patented products."[16] *Id.* at 950. If this Court prohibited SEB

---

[15] In both cases, the patent holder sold a product, but not the product that was subject to the patent at issue.
[16] In reaching this conclusion, the court distinguished two of the cases that Defendants rely on: "[Defendant] cites two cases where this court held lost profits unavailable to patentees who failed to exploit the patented invention. . . . *Trell* and *Lindemann*, . . . like others, merely reflect the general rule that lost profits are recoverable only if demonstrated by adequate evidence in the record." *King Instruments Corp.*, 65 F.3d at 951 (emphasis in original) (discussing *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1445 (Fed.Cir. 1990) and *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1406 n. 2 (Fed.Cir. 1990)). While the plaintiff in *King Instruments* sold a product, unlike SEB, which did not sell any product, the court's analysis leads this Court to reach the same

from recovering "damages adequate to compensate" simply because it did not sell the product itself, this Court would subvert the meaning of the statute.

Rather than have damages turn on whether or not a company lost sales, the Federal Circuit, in *Rite-Hite*, established a foreseeability test to guide courts in setting damages.[17]

> [U]nder § 284 of the patent statute, the balance between full compensation, which is the meaning that the Supreme Court has attributed to the statute, and the reasonable limits of liability encompassed by general principles of law can best be viewed in terms of reasonable, objective foreseeability. If a particular injury was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined, that injury is generally compensable absent a persuasive reason to the contrary. . . . Thus, to refuse to award reasonably foreseeable damages necessary to make [the plaintiff] whole would be inconsistent with the meaning of § 284.

*Rite-Hite Corp.*, 56 F.3d at 1546. Such a test ensures that infringers will not have to compensate a patentee for the remote consequences of the infringers' actions yet allows patentees to recover "damages adequate to compensate." SEB should be entitled to prove that it was foreseeable that SEB would lose money when Defendants infringed its patent.

To ultimately prevail, however, SEB must show more than the fact that it is T-Fal's parent company. The Federal Circuit has held that the existence of a relationship between two companies is not enough to establish damages because separate corporate entities must endure both the benefits and burdens of their chosen corporate form. *See Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) ("Poly-America and Poly-Flex have a common parent corporation and are not

---

conclusion. If SEB can show that it lost profit from T-Fal's sales because of Defendants' alleged infringement, it should be able to recover damages in an amount that would make it whole.

[17] The Defendants relied on the *Panduit* test, established in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978). The *Panduit* test, however, is not the only way a patentee may prove that it is entitled to lost profits. *See Rite-Hite Corp.*, 56 F.3d at 1545.

simply divisions of a single corporation, but are separate corporate entities. Their parent has arranged their corporate identities and functions to suit its own goals and purposes, but it must take the benefits with the burdens. While we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product, Poly-America and Poly-Flex may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure--in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee. . . . While Poly-America may have the right to sue under its patents, both as an owner and as a back-licensee, it can recover only its own lost profits, not Poly-Flex's."). Thus, at trial, SEB must show what damages *it* sustained from Defendants' actions.

In short, Defendants are not entitled to summary judgment on this issue. As the amount of damages is a question of fact, it is for the jury to determine how much, if anything, SEB is entitled to recover.

## B. Attorney-Client Privilege

During oral argument on the summary judgment motion, SEB asked this Court to order Defendants to turn over materials relating to opinions given by one of the Defendants' attorneys. For the reasons explained below, Defendants must turn over said materials to SEB.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383,

389 (1981). The purpose of the privilege is to encourage open communication between attorneys and their clients.

The privilege, however, is not limitless. "[B]ecause invocation of the attorney-client privilege will necessarily exclude relevant evidence from consideration, its application must be limited in some circumstances." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). For example, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."[18] *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000). "Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) ("It is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted.")

As discussed above, Defendants claim that their reliance on opinions from counsel shield them from liability under § 271(b). To that end, Defendants have disclosed materials concerning opinions given by two different attorneys. Defendants have not, however, disclosed materials concerning an opinion given by a third attorney, Thomas Adams, Esq. After an in camera review, this Court concludes that Defendants must disclose said materials.[19] Mr. Adams addressed the exact issue that the other two

---

[18] Such situations result in the oft-mentioned phrase that the attorney-client privilege cannot be used as both a shield and a sword. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).

[19] Defendants argue that they should not be required to turn over materials relating to Mr. Adams opinion because Mr. Adams was hired after SEB filed its lawsuit against Sunbeam and Defendants. Defendants

attorneys did, namely, whether Defendants' deep fryer infringed any patents.[20]

Defendants cannot use opinions from two attorneys to establish that it relied in good faith on opinions from counsel without disclosing the opinions of their third attorney. *See Abbott Laboratories v. Baxter Travenol Laboratories, Inc.*, 676 F.Supp. 831, 832 (N.D.Ill. 1987) ("By virtue of producing the three opinions regarding infringement of the patent here defendant has waived his privilege as to any other such opinions of counsel on the same subject matter."); *FMT Corp. Inc. v. Nissei ASB Co.*, 24 U.S.P.Q.2d 1073, 1075 (N.D.Ga. 1992) ("[Defendant] must produce to [plaintiff] not only the opinions upon which [defendant] has chosen to rely, but also all other attorney communications on the same subject matter and all documents relied upon or considered by counsel at the time and in conjunction with rendering that opinion."); *Thorn Emi North America, Inc. v. Micron Technology, Inc.*, 837 F.Supp. 616, 621 (D.Del. 1993) ("When an alleged infringer decides to respond to a claim . . . by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice."). Thus, Defendants must disclose to SEB all materials concerning Mr. Adams's opinions.

---

assert that the status of Mr. Adams is of litigation counsel, not opinion counsel. After reviewing the documents, however, this Court concludes that Mr. Adams functioned precisely as opinion counsel. It is therefore irrelevant that he was hired after the commencement of the Sunbeam action.

[20] Defendants further argue that Mr. Adams's opinions are outside the subject matter of the waiver because of the timing of his opinions. The opinions of the two attorneys disclosed by Defendants were given in August 1997 and December 1999 while Mr. Adams provided his opinion in the summer of 1998. This Court does not find Defendants' arguments persuasive. Simply because the opinions were issued in different years has no bearing on whether the opinions address the same subject matter.

### III. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is denied. Further, Defendants are ordered to turn over all materials concerning opinions given by Thomas Adams, Esq. to Defendants.

IT IS SO ORDERED.

_____
Stephen C. Robinson, U.S.D.J.

Dated: White Plains, New York
_____, 2005